***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Baddour and the briefs and arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award. The Full Commission AFFIRMS with modifications the Opinion and Award of the Deputy Commissioner.
 *********** *Page 2 
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between the parties at all relevant times.
3. Defendant is a duly qualified self-insured, with Sedgwick CMS as the third-party administrator. On the alleged date of injury and through January 1, 2009, Gallagher Bassett Services, Inc. was the third-party administrator for defendant.
4. Plaintiff's average weekly wage was $408.44, yielding a compensation rate of $272.31.
 *********** EXHIBITS
The following exhibits were admitted into evidence:
 (a) Stipulated Exhibit 1: Pre-Trial Agreement
 (b) Stipulated Exhibit 2: Plaintiff's Medical Records
 (c) Stipulated Exhibit 3: Plaintiff's Medical Bills
 (d) Stipulated Exhibit 4: Plaintiff's Personnel File Documents
 (e) Plaintiff's Exhibit 1: Diagram Drawn by Plaintiff at Hearing
 *********** ISSUES *Page 3 (a) Whether plaintiff's seizure at work on June 6, 2007 was a result of the alleged trauma to her head at work on May 24, 2007; and
 (b) If so, to what benefits, if any, is plaintiff entitled.
 ***********
Based upon the competent, credible evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 53 years old. Plaintiff worked for defendant as a store clerk at defendant's business which sells crafts and household goods. Plaintiff's duties included stocking, selling, and building displays. Plaintiff had been working for defendant for approximately four years prior to May 24, 2007.
2. On May 24, 2007, while attempting to hang a mirror on a display gondola above her head, a second mirror weighing 50-60 pounds and having a metal frame was dislodged and struck plaintiff on the top of her head. The blow caused plaintiff to slump to the floor, but she does not recall losing consciousness.
3. Plaintiff thereafter had a contusion over the left top of her head. She was provided an ice pack by her supervisor and was allowed to rest in the back room.
4. Plaintiff went to her mother's house that evening, and her mother observed a large knot on plaintiff's head and observed plaintiff was in pain. Plaintiff did not seek treatment in the emergency room because of having sustained prior similar incidences, for which plaintiff received only prescriptions for pain medication from visits to urgent care. *Page 4 
Approximately one year prior to this incident, plaintiff was hit on the head by a falling mirror and about six months prior to the incident plaintiff was hit on the head when a lamp fell from a shelf.
5. Plaintiff continued to work at her regular job with defendant. After the blow to her head, plaintiff had daily headaches. She was nauseated at times and had difficulty with word production. She knew what she wanted to say, but the words did not come out correctly. Plaintiff also experienced tingling in her right arm which would come and go.
6. On June 6, 2007, plaintiff had a seizure at work and collapsed while sitting on a stool. Plaintiff did not regain consciousness until after being taken to the hospital. She could not recall the circumstances leading up to the seizure.
7. Plaintiff was transported to Presbyterian Hospital and underwent a brain CT scan. The radiologist's report stated the brain CT results showed a probable acute hematoma in the left frontal lobe up to 2.2 centimeters in diameter.
8. On June 7, 2007, plaintiff underwent an MRI of the brain performed by Dr. Anthony Bell, a neuroradiologist. Dr. Bell's report showed a subacute hemorrhage in the white matter of the left frontal lobe measuring 2.2 centimeters in diameter.
9. On June 8, 2007, an EEG study revealed abnormal findings. The abnormal findings were the result of intermittent slowing in the left frontal region of the brain consistent with a structural lesion.
10. On June 11, 2007, defendant filed a Form 19 Employer's Report of Employee's Injury to the Industrial Commission. Subsequently, on January 14, 2008, *Page 5 
defendant filed a Form 60 Employer's Admission of Employee's Rightto Compensation accepting plaintiff's seizure as compensable. Defendant paid $8,713.60 in indemnity benefits to plaintiff.
11. Plaintiff saw Dr. Kenneth T. Ashkin on June 14, 2007. Dr. Ashkin treated plaintiff for narcolepsy both prior to and following the seizure. Prior to plaintiff's seizure, plaintiff had been treated for narcolepsy by Dr. Ashkin for 20 years.
12. On June 27, 2007, plaintiff treated with Dr. Mark Smith of Carolina Neurosurgery and Spine Associates. On July 16, 2007, a CT of plaintiff's brain was reviewed by Dr. Christopher G. Ullrich. Dr. Ullrich stated there appeared to be a resolving hematoma.
13. On July 23, 2007, Dr. Smith recommended a follow-up MRI. Plaintiff underwent the MRI on August 7, 2007. The MRI showed findings consistent with a cavernous angioma in the left frontal lobe.
14. On August 30, 2007, Dr. Ashkin noted, after the recent arteriogram and follow-up MRI of the brain, that plaintiff had a post-intracranial hemorrhage possibly related to an underlying cavernous angioma.
15. In the summer of 2008, plaintiff experienced instances of vertigo and losing her balance, causing her to fall and sustain further injuries, including bruising, breaking her toes and dislodging her teeth.
16. Plaintiff underwent an independent medical examination by Dr. Del Curling, a retired neurosurgeon, on February 26, 2008. Dr. Curling's opinion was that plaintiff had a left frontal cavernous malformation presenting with a seizure disorder on *Page 6 
June 6, 2007 that may have occurred in association with a small, spontaneous hemorrhage within the malformation. Dr. Curling did not causally relate the cavernous malformation or seizure disorder to any work event or injury. Dr. Curling stated that cavernous malformations are congenital lesions. He noted there was no evidence suggesting a prior head injury contributed to her current medical condition.
17. At his deposition, Dr. Curling stated that plaintiff told him that other than a knot on her head, she was asymptomatic between the head incident until the seizure. When informed about the headaches and altered psychological state plaintiff described between the two events, Dr. Curling stated that these symptoms "would certainly raise the possibility that there was some intracranial injury that occurred that subsequently led to the seizure."
18. Plaintiff underwent a second independent medical examination by Dr. Eric Borresen, a practicing neurologist with Mecklenburg Neurology in Charlotte. Dr. Borresen recorded a history from plaintiff of headaches, nausea, dizziness, tingling in her arms and difficulties with word production existing after the blow to her head until the time of her seizure. Dr. Borresen noted that the location of plaintiff's hematoma in the left frontal lobe of her brain was consistent with the symptoms plaintiff reported. Dr. Borresen testified that Dr. Anthony Bell, the neuroradiologist, interpreted plaintiff's June 7, 2007 MRI as showing a "subacute hemorrhage" which refers to a hemorrhage that is "usually three to four days up to a couple of weeks" old. Additionally, Dr. Borresen explained that MRIs are superior tests for determining when a hemorrhage occurred as compared to CT scans, and therefore plaintiff's June 7, 2007 MRI should be given greater *Page 7 
weight than her June 6, 2007 CT scan which was interpreted as showing an "acute hematoma."
19. Dr. Borresen's opinion was that, between plaintiff being hit by the mirror and her suffering a seizure, "[i]t is more likely than not that she had an expanding hematoma over that time interval causing these symptoms, and that the hematoma triggered the seizure that she suffered on June 6, 2007." Plaintiff's symptoms that were indicative of an injury to the left frontal lobe of the brain, as well as the MRI scan showing a subacute hemorrhage that was taken 24 hours after she was struck in the head, suggested to Dr. Borresen that "this hemorrhage actually had occurred several days before she came to the emergency room with the seizure, and that the hemorrhage clearly was preexistent and actually triggered that seizure."
20. Dr. Borresen agreed with Dr. Curling that most cavernous malformations bleed spontaneously and that seizure is a common manifestation of these malformations. However, Dr. Borresen disagreed with Dr. Curling's opinion that a spontaneous bleed caused plaintiff's seizure. Rather, Dr. Borresen believed that from the timing, the interim symptoms and the subacute nature of the hemorrhage and initial MRI scan, plaintiff's injury to the head caused the cavernous angioma to bleed and led to the seizure.
21. Dr. Kenneth Ashkin, plaintiff's treating neurologist, agreed with Dr. Borresen's opinion that more likely than not the trauma to plaintiff's head caused an expanding hematoma, which caused the symptoms experienced by plaintiff, and triggered the seizure she experienced on June 6, 2007.
22. Upon consideration of the evidence as a whole, including plaintiff's *Page 8 
credible testimony at the hearing before the Deputy Commissioner, the Full Commission finds the history of plaintiff's symptoms between the head incident and the seizure relied upon by Dr. Borresen to be credible. Dr. Curling did not consider the history of these symptoms when forming his opinions. Additionally, Dr. Borresen's opinions are based upon the MRI interpretation of Dr. Bell, a neuroradiologist specifically trained in interpreting brain studies, who read the MRI films as showing a "subacute hemorrhage" which existed prior to June 6, 2007. Dr. Curling's opinion that plaintiff experienced a "spontaneous hemorrhage" on June 6, 2007 is based upon his own reading of the MRI films; however, Dr. Curling is not a radiologist or a neuroradiologist.
23. For the above stated reasons, the Full Commission gives greater weight to the opinions of Dr. Borresen and Dr. Ashkin than to the opinions of Dr. Curling. Accordingly, based upon the greater weight of the evidence, the Full Commission finds that the trauma to plaintiff's head on May 24, 2007 caused an expanding hematoma, which caused the symptoms experienced by plaintiff, and triggered the seizure she suffered on June 6, 2007.
24. Following his evaluation of plaintiff, Dr. Borresen stated in his report that plaintiff could work at "relatively sedentary work" and not involving climbing or balance, and further recommended that her driving be restricted until further evaluation. Plaintiff has not reached maximum medical improvement and has not been assigned permanent work restrictions. Since her seizure on June 6, 2007, plaintiff has not been offered light duty work by defendant during the healing period and has not worked for any other employer. Plaintiff is presumably still an employee of defendant. *Page 9 
25. Defendant accepted plaintiff's seizure as compensable pursuant to a Form 60 and paid her indemnity benefits but later unilaterally terminated her benefits and denied the compensability of the seizure.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On May 24, 2007, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. The greater weight of the evidence of record establishes that plaintiff's seizure on June 6, 2007 was a result of the head trauma she sustained on May 24, 2007, and thus plaintiff's seizure on June 6, 2007 is compensable. Defendant accepted plaintiff's seizure as compensable on a Form 60 and paid her indemnity benefits before terminating benefits without approval of the Commission. N.C. Gen. Stat. §§ 97-2(6), 97-18.1.
3. In a claim for additional compensation for medical treatment, the treatment must be "directly related to the original compensable injury." Pittman v. Thomas Howard,122 N.C. App. 124, 130, 468 S.E.2d 283, 286, disc. reviewdenied, 343 N.C. 513, 471 S.E.2d 18 (1996). It is the burden of the injured worker to prove that the injury or condition being treated is causally related to the compensable injury by accident.Snead v. Mills, Inc., 8 N.C. App. 447, 174 S.E.2d 699 (1970). The North Carolina Court of Appeals stated in Parsons v. Pantry,Inc., 126 N.C. App. 540, 485 S.E.2d 867 (1997), *Page 10 
that once the Commission has found a claim compensable, a rebuttable presumption arises that the treatment is directly related to the original compensable injury. The burden then shifts to defendant to prove that the medical treatment is not directly related to the compensable injury. Id. In Reinninger v. PrestigeFabricators, Inc., 136 N.C. App. 225, 523 S.E.2d 720 (1999), the Court of Appeals applied the Parsons presumption to a case in which the parties entered into a Form 21 Agreement for Compensation which was approved by the Commission and therefore constituted an "award" of the Commission, pursuant to N.C. Gen. Stat. § 97-82. The Court of Appeals has also held that an employer's payment of compensation pursuant to a Form 60, as in the case before us, is an award of the Commission and that theParsons presumption applies. Perez v. American Airlines,174 N.C. App. 128, 620 S.E.2d 288 (2005), disc. reviewimprovidently allowed, ___ N.C. ___, 634 S.E.2d 887 (2006).
4. In the case at bar, plaintiff's June 6, 2007 seizure was the direct and natural consequence of the injury by accident she sustained on May 24, 2007 and was accepted as compensable by defendant by the filing of the Form 60. As such, theParsons presumption applies and defendant failed to rebut the presumption that the medical treatment is directly related to the compensable injury. Parsons v. Pantry, Inc., supra.;Starr v. Charlotte Paper Co., Inc.,8 N.C. App 604, 175 S.E.2d 342 (1970).
5. As a result of her compensable injury and resulting seizure, plaintiff continues to be disabled from any employment and is entitled to payment by defendant of temporary total disability compensation from June 6, 2007 and continuing until she returns to work or until further Order of the Commission. N.C. Gen. Stat. § 97-29. *Page 11 
6. Plaintiff is entitled to payment of medical expenses incurred or to be incurred as a result of her compensable seizure and brain injury, as may reasonably be required to effect a cure, provide relief, or lessen the period of disability. N.C. Gen. Stat. §§ 97-2(19); 97-25.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney's fee approved below, defendant shall pay temporary total disability compensation to plaintiff at the rate of $272.31 per week from June 6, 2007 and continuing until she returns to work or further Order of the Commission. Amounts previously paid by defendant for this period shall offset the amount owed under this Award. As much of said compensation as has accrued shall be paid in a lump sum.
2. Defendant shall pay for medical expenses incurred or to be incurred as a result of plaintiff's compensable seizure and brain injury as may reasonably be required to effect a cure, provide relief, or lessen the period of disability.
3. A reasonable attorney's fee in the amount of 25% is hereby approved to be deducted from sums due plaintiff and paid directly to plaintiff's counsel in one lump sum of the accrued amount due plaintiff and thereafter by deducting every fourth compensation check due plaintiff.
4. Defendant shall pay the costs due the Commission.
This the 19th day of May, 2010. *Page 12 
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ PAMELA T. YOUNG CHAIR
 S/___________________ DIANNE C. SELLERS COMMISSIONER